### BANNON *v.* BURNES *et al.*

*(Circuit Court, W. D. Missouri, W. D. September 2, 1889.)*

**1. MUNICIPAL CORPORATIONS—TAXATION—SALE FOR NON-PAYMENT.**

A city charter (charter of Kansas City, § 50, art. 6) provided that if realty could not be sold for the amount of taxes, interest, and cost, the city auditor should, if so directed, bid it off to the city for that amount, and make a record of the fact of the sale to the city. No certificate was to issue upon such sale, but any person might thereafter pay to the collector the sum so bid, and receive a certificate, which should be assigned to him by the city auditor, which certificate should vest all the interest of the city in the realty, and entitle such person to the same rights and privileges as if he had purchased the same at a tax-sale. *Held*, that the bidding in by the city constituted a public sale for taxes within the meaning of the section conferring upon the au-

ditor power to offer at public sale property on which taxes were due, and in the absence of any express authority in the charter, the auditor had no power to subsequently offer it for sale.

2. SAME—CONCLUSIVENESS OF DEED—DUE PROCESS OF LAW.

The defect in the title is not cured by a provision of the charter declaring the tax-deed, regular in form, conclusive evidence of almost every essential fact, except that proof might be made that the taxes had been paid, or the property was exempt, or had been redeemed. If the property was sold at the first sale, the auditor had no jurisdiction over it, and it would be taking property without due process of law to make tax-deeds conclusive evidence of facts essential to jurisdiction.

3. SAME—PROPERTY CEDED TO UNITED STATES.

Laws Mo. 1870, p. 355, gave the consent of the state to the acquisition by the United States of land in Kansas City for the erection of a post-office, and declared that the land when acquired, should, so long as it remained the property of the United States, be exonerated from all taxes, assessments, and other charges levied or imposed under the authority of the state. By the charter of Kansas City the lien for city taxes attaches on January 1st, but the levy is not made until the third Monday in April. *Held,* that land so acquired by the United States between January and April was not subject to taxation by the city.

At Law. Ejectment.

*Johnson & Lucas,* for plaintiff.

*L. C. Krauthoff,* for defendants.

PHILIPS, J. This is an action of ejectment to recover possession of lot 62 in Swope's addition to the city of Kansas, Mo. This lot is the north end of the site on which is constructed the United States custom-house, post-office, and court-house. The defendants are the surveyor of the port and custodian of the custom-house building, and other government officials occupying offices in said building. The plaintiff claims title under a tax-deed from the collector of Kansas City, dated November 6, 1885, predicated on a sale made January 4, 1884, for the payment of taxes claimed to be delinquent for the year 1879. At the time said taxes became delinquent, Malvina D. Hughes was the owner of said property, and on the 9th day of April, 1879, she conveyed the same by warranty deed to the United States, for a valuable consideration, to be used and occupied by it for a United States custom-house, post-office, court-house, and other like public business. The cause was submitted to the court for trial without the intervention of a jury. The facts in evidence, so far as they are material, will appear in the following discussion. Various objections are urged by counsel for the government against the validity of the tax-deed. Without considering and determining others, we pass at once to the consideration of one of gravest importance. The record evidence shows that at the tax-sale held in said city in October, 1879, this property, after due steps taken thereto, was put up for sale for delinquent taxes of 1879, and was bid in by the city auditor for the city, pursuant to directions from the city comptroller. Section 50, art. 6, of the city charter provides, in substance, that if any real property cannot be sold for the amount of taxes, interest, and cost, the city auditor shall, if directed by the comptroller, bid it off to the city for such amount. Thereupon the city auditor shall make a record of the same in a book of sale, by stating such fact of a sale to the city, and the date of the same. No

certificate, however, shall be issued on such sale; but any person may thereafter pay to the city collector the sum so bid, including costs, etc., and receive from the collector a certificate dated the day when it is issued, describing the property, etc., which certificate, before it shall be of any validity, shall be assigned to such person by the city auditor, who shall note the same on his book of sales, and such certificate, so assigned by the city auditor, shall vest all the interest of the city in or to such real property in such person; and such certificate shall be assignable to the same extent and in like manner as certificates given to purchasers at tax-sales, and shall entitle such person to the same rights and privileges thereunder as if he had purchased the same at a tax-sale.

The question arises, by what authority of law was this property again advertised and sold to plaintiff in 1884? There does not appear in the charter any express provision for readvertising and selling as delinquent land so bought in by the city. As the whole authority of the city collector to take any action or step towards the sale of the citizen's property and the divestiture of his title comes from the legislative grant of the sovereign, the state, any such course as was pursued in this case should be clearly marked out in the charter, or appear by necessary implication. The charter does specify what the city may do with the property so bought in by it. Said section 50 provides for its transfer by assignment to any one who will pay the amount of the bid, with penalties, costs, etc.; and section 76 provides for suit by the city, whereby the equity of redemption of the owner may be cut off, and for the absolute sale *in rem* under special execution. It is not to be concealed that other provisions of the charter seem to contemplate that all unpaid taxes from year to year shall be carried on the land-tax books, so as to show all the antecedent unpaid taxes, and for what year delinquent. But all these general provisions precede and lead up to the section directing the public sale for such delinquent taxes. Section 42 declares that "on the first Monday in October in each year the city collector shall offer at public sale, at his office, in the city of Kansas, all real property on which taxes or special assessments shall remain due and unpaid, and such sale shall be made for and in payment of the total amount of taxes and special assessments, interests, and costs, due and unpaid on such real property." Then follows section 43, which prescribes with much particularity what the notice of sale shall contain. It shall contain "the several parcels of real property to be sold, and all delinquent taxes and assessments thereon, and such real property as has not been advertised and sold for the taxes of any previous year or years," etc. Section 50 clearly treats the buying in by the auditor for the city as a sale; for it expressly declares that when any real property shall be bid off for the city, it shall be the duty of the city auditor to make a record of the same in a book of sales, by stating such fact of sale to the city. And as further proof, by the latter part of this section, provision is made for any stranger taking the benefit of the sale by paying to the city collector, not the taxes, etc., yet due and unpaid, but "a sum of money equal to the amount of all taxes, interests, and costs" on such property at the time of such payment; and the certificate to be

given to such assignee of the city "shall vest all the interest of the city in or to such real property in such person." "All the interest of the city," as here expressed, necessarily implies that the city acquired such interest as a purchaser at such land-tax sale. It could have no other assignable interest. And the fact that the holder of a certificate of payment of taxes to the city collector is placed upon the same plane of right as the original purchaser at public sale, being entitled at the end of the prescribed period to an absolute deed, forcibly demonstrates that in contemplation of the charter the bidding in for the city constitutes a sale; and therefore this lot could not be readvertised and sold, because it could not be said, as required in said section 43, that it was "such real property as has not been advertised and sold for the taxes of any previous year." If after this "bid in" for the city some third party had paid to the city the sum equal to the taxes, etc., and received the prescribed certificate, and it had ripened into a right to a deed, such deed, to be of any validity, would have to recite that this property was sold at public sale and for the payment of taxes. Section 65, art. 6, of the Charter; *Sullivan* v. *Donnell*, 90 Mo. 282, 2 S. W. Rep. 264; *Hopkins* v. *Scott*, 86 Mo. 140. Consequently and necessarily the bidding in by the city constitutes a public sale for taxes, as prescribed in section 42 of the charter. The power to so advertise and sell is conferred alone by said section 42, except in the instance where the land for the lack of any bidder may not be sold at all. Section 75. Once exercised by the delegated agent, the power to advertise and sell was exhausted, and the agency therefor ceased. Any reassertion of such power must have for its warrant express authority. We fail to find it in terms in the charter.

Plaintiff's tax-title, therefore, must fail, unless, as suggested in the argument, the imputed infirmity be helped by the provision of section 64 of said article of the charter, which declares that the tax-deed, made after the prescribed form, shall be conclusive evidence of almost everything essential to its validity, except that proof may be made that the taxes were paid before sale, or that the property was not subject to this taxation, or that it had been redeemed, or the money tendered. It is to be conceded that the provisions of this charter respecting the validity of such deeds are very sweeping. And while the courts should treat with great respect the enactments of the legislative department of government, yet the courts, which stand as the last resort of the citizen, and the sworn guardian of his property rights, cannot fail to recognize that there are some things which even the legislature cannot do. It cannot take the citizen's private property, even for public use, without due process of law. It cannot prescribe a method by, and the conditions on which, property may be sold for taxes, and by the same act declare that when sold the deed shall be good, although the prescribed method was not pursued and the required conditions of sale were not regarded; especially where such conditions are precedent facts essential to confer jurisdiction on the body or person undertaking to sell. Due process of law is not any process which legislative power may devise. As said by Mr. Justice CURTIS in *Murray's Lessee* v. *Improvement Co.*, 18 How. 276:

"The article [of the constitution] is a restraint on the legislative as well as on the executive and judicial powers of the government, and cannot be so construed as to leave congress [the legislature] free to make any process 'due process of law ' by its mere will."

The city charter prescribes that certain facts shall exist to authorize the city collector to advertise and sell, as has already been stated. It is a well-established principle of law that in proceedings *in invitum* looking to the seizure and appropriation of private property for public uses, every fact which in its nature is jurisdictional must exist before jurisdiction attaches to the tribunal attempting the seizure and appropriation. "Power is conferred upon the court, to be exercised on certain defined and limited contingencies; and these contingencies must have happened, and the conditions on which it can act must have been performed, before its act can be valid. Its authority does not attach until the law has been pursued and complied with." *Lagroue* v. *Rains*, 48 Mo. 538. "Any statute is unconstitutional which attempts to make a tax-deed conclusive evidence as to jurisdictional facts, or facts vital to the exercise of the power of taxation or sale, as distinguished from such facts as are merely formal, or of routine, or pertaining to the regularity or the manner of the exercise of such power." Black, Tax Titles, § 253. Judge Cooley (Tax'n, 470) expresses the principle thus:

"The officer who makes the sale sells something he does not own, and which he can have no authority to sell, except as he is made the agent of the law for the purpose. But he is made such agent only by certain steps, which are to precede his action, and which, under the law, are conditions to his authority."

If, therefore, as we have attempted to show, the sale of this property to the city in 1879 withdrew it from future sale by the collector, his advertisement and sale in 1884 were clearly *coram non judice.* He had no jurisdiction over the subject-matter. The supreme court of this state has held that it was not within the constitutional competency of the legislature to make such deeds conclusive evidence to such extent as to cut off inquiry as to whether facts vitally essential to the exercise of the jurisdiction in the tax proceedings existed. *Abbott* v. *Lindenbower*, 42 Mo. 162; *Ewart* v. *Davis*, 76 Mo. 129–134. Section 82 of this same article of the charter declares that—

"The tax-book and all other books and papers made or kept by the officers of the city, or in any manner relating to any tax, shall be received in all courts as evidence of all the facts stated therein, and of the validity of the tax-deed," etc.

It would indeed be a queer and unique statute which should provide for the admission in evidence in all courts, to support the validity of a tax-deed, the city books, or other books and papers pertaining thereto, while at the same time and place declaring that such evidence should not be admitted to impeach the validity of the deed. The sword of justice should be two-edged, and cut both ways. The office of a corresponding provision under the revenue laws of the state was held by the supreme court to admit such records and papers in evidence to assail a tax-title

where it was sought, as here, to shut off such proof by the conclusive effect of the deed itself. *Ewart* v. *Davis*, 76 Mo. 135. It is not apparent that there is anything in the points ruled in *De Treville* v. *Smalls*, 98 U. S. 517, in conflict with what is here held; for neither the statute there construed, nor those of the states cited, extended to or undertook to assert the position that the deed itself should conclude all inquiry as to whether the property at the time of the sale was subject to the summary process for taxes. In other words, the statute did not declare an *ex parte* deed valid where there was a lack of power to sell in the mode pursued. For, as said by the court in the *De Treville Case:* "It [the deed] may be regular in form and in the mode of its conduct, but it cannot be valid, unless authorized by law." *Vide Marsh* v. *Fulton Co.*, 10 Wall. 683, 684; *Railroad Co.* v. *Parks*, 32 Ark. 131; *Radcliffe* v. *Scruggs*, 46 Ark. 96.

If, however, our conclusion as to the validity of the tax-deed be untenable, there is another obstacle in the way of plaintiff's recovery, which we think is unsurmountable. On the 31st day of January, 1870, the state of Missouri by legislative enactment (Laws Mo. 1870, p. 355) gave its consent to the purchase of this property by the United States. The essential provisions of this act are, in substance, as follows:

(1) The consent of the state is given to the purchase by the United States of a piece of land in Kansas City, not exceeding one acre in quantity, on which to erect a building for the accommodation, &c., of the United States courts, post-office, internal revenue, and other government offices. (2) Jurisdiction is given to the United States over this land when purchased, so long as it shall use the same, subject to the right of entry by the state authorities for the purpose of executing civil and criminal process.

Then follows section 4:

"The jurisdiction hereby ceded shall not vest until the United States shall have acquired the title to the land by purchase or grant, and so long as the said land shall remain the property of the United States, when acquired as aforesaid, and no longer, the same shall be and continue exonerated from all taxes, assessments, and other charges which may be levied or imposed under the authority of the state."

So the sovereign—the local state government—consented to this purchase by the superior government before it was made, and covenanted on its part that, when the United States should acquire the title of the owner, the jurisdiction of the state should cease over the property, and that of the United States should attach, with the single reservation of the right of entry for service of legal process. Then follows the covenant of assurance that, whenever the state obtained such property by purchase or grant, the property thenceforth should be forever "exonerated from all taxes, assessments, and other charges, which may be levied or imposed under the authority of the state." The taxing power is the attribute of sovereignty, and the exercise of the highest jurisdiction. As it is a power to be exercised or forborne at the will of the sovereign having jurisdiction, it follows logically that the sovereign may cede away such right, and release the burden. And when the grant has been accepted by the general government, and the conditions of the purchase have been fully

performed, such grant becomes a solemn compact, which the general government would not permit the state to violate. The term "exonerated" was, presumably, employed in its ordinary acceptation: "to be relieved of as a charge; to be discharged or exempted." Be the contention of plaintiff's counsel correct, that the lien of the city government on this property, so far as the owner and all other persons were concerned, attached on the 1st day of January, 1879, yet under the city charter (section 4, art. 6) the fiscal year begins on the third Monday in April, which in 1879 was the 21st day of April. The assessment is made between the 1st day of January and the third Monday of April, and is delivered to the council at its first meeting of the fiscal year. The council then by ordinance proceeds "to levy taxes for the fiscal year." A copy of this, with the assessment books, is delivered to the auditor, who then extends the taxes, and delivers the tax-book to the collector on the 1st day of May. Sections 20, 21. From which it is manifest that the taxes for the year 1879 were not levied until after the 9th day of April, and after the United States had acquired title to the property by purchase. The mere fact that the property owned on the 1st day of January became liable to taxes for that fiscal year would not avail for the purpose of taxation, without an assessment and levy. Taxes not assessed or levied can never become an effectual lien. *Heine* v. *Commissioners*, 19 Wall. 659; *Greenough* v. *Coal Co.*, 74 Pa. St. 486–500; Black, Tax-Titles, § 43. The state, by the act of cession, covenanted, in effect, that when the government should purchase this property it would not thereafter make any levy; and if the state itself had proceeded as did the city to make a levy for the purpose of taxation, after the 9th day of April, 1879, this property would have been exonerated therefrom. The municipal corporation of Kansas City is an integral part of the state. It is but an adjunct of the state power, to aid in carrying out the ends of government. It is therefore no less an action taken by the state when done through the agency of a subordinate municipal corporation. When the superior sovereignty ceded away its right and jurisdiction to make this levy and sale, it necessarily negatived and withdrew the power of its inferior, existing by its consent, and acting as one of its governmental instruments, to do that which itself could not. Cooley, Tax'n, (2d Ed.) 82–84; *U. S.* v. *Railroad Co.*, 17 Wall. 328, 329; *O'Donnell* v. *Bailey*, 24 Miss. 386–388; *Van Brocklin* v. *State of Tennessee*, 117 U. S. 178, 6 Sup. Ct. Rep. 670.

Hitherto it seems to have gone without question that if, after a city had taken steps looking to the enforcement of a tax, the state legislature passed an act exempting such property from taxation, it put an end to the right of the city to proceed. *Van Brocklin* v. *State of Tennessee, supra*, 175, 176. Moreover, section 8, art. 1, of the federal constitution declares:

"Congress shall have power * * * to exercise exclusive legislation in all cases whatsoever * * * over all places purchased by the consent of the legislature of the state in which the same shall be, for the erection of forts, magazines, arsenals, dock-yards, and other needful buildings."

The act of congress admitting the state of Missouri into the federal Union (section 4) "provided that no tax shall be imposed on lands or property of the United States." Congress authorized the secretary of the treasury to purchase this property for such needful buildings. 20 St. U. S. 39. Such buildings as were erected by the government on this lot are "needful" in the sense of the constitution, as they are a necessary means "employed by the government in executing its sovereign powers." *Fagan* v. *Chicago*, 84 Ill. 227. The moment, therefore, the government acquired this property, its jurisdiction over it became absolute and exclusive, except in the particular of the reservation expressed in the act of cession by the state legislature; and by the very law of the state's creation and admission into the federal Union its power to impose—to levy—a tax on this property, ceased,—died,—because by the purchase it became "lands or property of the United States." If the right of the state or its subordinate municipality be conceded to proceed to enforce by levy and sale a tax after the acquisition of the title by the government, the legal sequence would logically follow that the state could enter upon this territory, over which it had ceded jurisdiction to the United States, and oust the government officers, its judges, and ministerial officers, and deliver over the property to the purchaser, which is precisely what was sought to be accomplished by the institution of this action in the state court. This might produce serious embarrassments and complications, as it is calculated to obstruct the operations of the general government. Such ill-omened results the constitution designed to obviate by freeing such "needful" property, after acquisition of title by the United States, from state jurisdiction, process, or interruption, which might interfere with its full enjoyment for government purposes. *Railroad Co.* v. *Lowe*, 114 U. S. 525, 5 Sup. Ct. Rep. 995; *Van Brocklin* v. *State of Tennessee*, 117 U. S. 151, 6 Sup. Ct. Rep. 670.

Since writing the foregoing opinion my attention has been called to an opinion of Judge BREWER, of this circuit, delivered at Little Rock, Ark., in *Martin* v. *House, ante*, 694. The manuscript opinion is before me. The view expressed by me herein is not only entertained by Judge BREWER, but he applied the principle to the instance of a judgment creditor who had obtained his judgment lien on the property in the state court before acquisition of title by the government for the purpose of a custom-house, etc. The short statute of limitation prescribed by the city charter for bringing actions of ejectment against such tax purchaser, after deed obtained, it is scarcely needful to say, can have no application to this contention. In the first place, the provision applies only where the tax purchaser is in possession, and the action is brought "against" him. *Spurlock* v. *Dougherty*, 81 Mo. 171–182; *McReynolds* v. *Longenberger*, 57 Pa. St. 13–29. Such statutes of limitation do not run against the government. Nor can it be tolerated that the state legislature could enforce an act which required the general government to bring a possessory action for the recovery of property of which it was already possessed under the protection of constitutional authority. It follows that the issues are found for the defendants. Judgment accordingly.